# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

AMANDA R. KROEGER,      )
                               )
      Plaintiff,         )
                               )
      vs.              )     Case number 4:11cv1862 ERW
                               )                   TCM
MICHAEL J. ASTRUE,        )
Commissioner of Social Security,   )
                               )
      Defendant.     )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying the applications of Amanda Kroeger (Plaintiff) for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b. Plaintiff has filed a brief in support of her complaint; the Commissioner has filed a brief in support of his answer. The case was referred to the undersigned United States Magistrate Judge for a review and recommended disposition pursuant to 28 U.S.C. § 636(b).

## Procedural History

Plaintiff applied for DIB and SSI in November 2009, alleging a disability as of March 16, 2007, caused by degenerative disc disease. (R.[1] at 99-110.) Her applications

---

[1]References to "R." are to the administrative record filed by the Commissioner with his answer.

were denied initially and after a hearing held in October 2010 before Administrative Law Judge (ALJ) Randolph E. Schum.  (<u>Id.</u> at 7-19, 23-49.)  The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (<u>Id.</u> at 1-3.)

### Testimony Before the ALJ

Plaintiff, represented by counsel, and Delores Gonzalez, M.Ed., a vocational expert (VE), testified at the administrative hearing.

Plaintiff testified that she was then thirty years old and has completed the eighth grade.  (<u>Id.</u> at 26.)  When asked why she had left school, Plaintiff replied, "Just young and stupid."  (<u>Id.</u>)  She had tried to obtain a General Equivalency Degree (GED), but had not finished it.  (<u>Id.</u>)  Plaintiff is a "[l]ittle under" 5 feet 4 inches tall and weighs 111 pounds. (<u>Id.</u>)  She had lost 80 pounds because she had been told it would help with her back; it did not.  (<u>Id.</u> at 30-31.)  She lives with her husband, four children, and mother.  (<u>Id.</u> at 34.)  Her mother helps with the cooking, cleaning, and child care.  (<u>Id.</u>)  Plaintiff sometimes helps with the shopping, but her husband primarily does that.  (<u>Id.</u>)

Plaintiff last worked in March 2007, doing "line work" in the mail room.  (<u>Id.</u> at 26-27.)  She had worked full-time for approximately six to eight months.  (<u>Id.</u> at 27.)  The job required that she lift packages or boxes weighing between five to twenty to fifty pounds. (<u>Id.</u>)  This job was the longest, consistent job she has ever held.  (<u>Id.</u>)  She worked there until the day she had back surgery.  (<u>Id.</u> at 28.)

Plaintiff testified that her back pain improved for a short time after the surgery, but then was as bad as before.  (Id.)  She has been evaluated for additional surgery, but has not decided yet whether to proceed.  (Id. at 28-29.)  She also has had injections in her back; these did not help at all.  (Id. at 35.)

She has pain in her lower back that radiates down both sides of her hips to her big toes.  (Id. at 29.)  The pain is constant.  (Id.)  Her doctor has told her she has back spasms.  (Id. at 31.)  She has them sometimes two or three times a day, and sometimes more often.  (Id.)  Each lasts from a few seconds to longer than a minute and are in her lower back.  (Id. at 31-32.)  When she has one, she "stops . . . dead in [her] tracks."  (Id. at 32.)  Plaintiff also has problems with her neck.  (Id. at 35.)  Her doctors would like to do an MRI (magnetic resonance imaging) on her neck, but are waiting to do so.  (Id.)

Plaintiff drives a manual-shift four-wheel drive truck.  (Id. at 30.)  She does not like to drive it.  (Id.)

Plaintiff had home-schooled her older children for two years, but had to stop because it was too hard on her.  (Id. at 32.)  She needed to be able to lie down and rest at times and could not with the children at home.  (Id.)  She tries to take a nap when she returns home from dropping off her children at school and lies down again around noon.  (Id. at 32, 36.)  She takes medication, but there are side effects of irritability, visual problems, anger, and "loop[iness]."  (Id. at 33.)  She has not discussed these side effects with her doctor because she has not seen him since she began taking the medication.  (Id. at 33-34.)  Another medication had caused her to be extremely irritable, but she no longer takes it.  (Id. at 33.)

Plaintiff does not cook, clean, or shop because she cannot stand for long or lift much. (Id. at 34.) The most she can lift is fifteen pounds, and this amount she can not carry far. (Id. at 35.) She can lift a gallon of milk without pain, but can not carry it around. (Id. at 35-36.) The longest she can stand in one place is for fifteen minutes. (Id. at 36.)

Ms. Gonzalez testified as a VE. The ALJ first asked her about a hypothetical claimant age twenty-six at the alleged date of onset, with an eighth-grade education, past work experience as a production assembler and postage machine operator, and capable of performing the full range of light work.[2] (Id. at 37-38.) This person could return to work as a production assembler and as a postage machine operator as these jobs were customarily performed in the national economy and described in the *Dictionary of Occupational Titles* (DOT), but not as performed by Plaintiff. (Id. at 38.)

If this hypothetical person could perform the full range of sedentary work[3] only, Plaintiff's past work would be unavailable. (Id.) This person could, however, work as a stuffer or an egg processor. (Id. at 38-39.) These jobs were sedentary and unskilled and existed in significant numbers in the national, state, and local economies. (Id.)

If this hypothetical claimant had to change positions every fifteen minutes, jobs such as information clerks could be done with a sit/stand option. (Id. at 39.) If this person additionally lost concentration every time she changed positions, this person would not be

_____

[2]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b).

[3]"Sedentary work involves lifting no more than 10 pounds at a time and occasional walking and standing." 20 C.F.R. § 404.1567(a).

able to maintain competitive employment. (Id. at 40.) In order to maintain such employment, a person has to be on task for at least two hours before taking a short break. (Id.) If the person also has to lie down during the day at times other than scheduled breaks, as Plaintiff testified she did, this person would not be able to work competitively. (Id.)

The VE stated that her testimony is consistent with the DOT. (Id. at 39.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to her applications, and records from various health care providers.

When applying for DIB and SSI, Plaintiff completed a Disability Report, listing her height as 5 feet 4 inches and her weight as 128 pounds. (Id. at 134-42.) She is unable to work due to "[d]egenerative disc disease affecting various parts of [her] body." (Id. at 135.) The disease causes her hips and lower back to be very painful. (Id.) The pain is constant. (Id.) Her impairment prevents her from standing or sitting for long periods of time, lifting "very much weight," walking far, and concentrating. (Id.) She attributed this last difficulty to the pain medication she was taking. (Id. at 135, 148.) Her impairment first interfered with her ability to work in the Spring of 2007 and caused her to be unable to work on March 16, 2007. (Id. at 135.) She stopped working when she had back surgery. (Id.) The job she had held the longest was as a factory worker. (Id. at 136.) She held this job in various factories from 1999 to 2003 and from 2006 to March 2007. (Id.) She left school after the eighth grade, and had been in special education classes. (Id. at 140.) She had not

participated in an individualized education program (IEP) or in a vocational rehabilitation program.  (Id. at 141.)

Asked to describe on a Function Report what she did from the time she awoke until going to bed, Plaintiff reported that she wakes two of her children and takes them to school a block away, home schools her two other children, prepares a meal if her mother does not, tries to rest, and picks up the two children from school.  (Id. at 143.)  Her mother helps cook and clean and with child care.  (Id. at 144.)  The pain caused by Plaintiff's impairment prevents her from sleeping well.  (Id.)  She cannot bend over without pain and has difficulty getting dressed.  (Id.)  It hurts her to do household chores or yard work.  (Id. at 145-46.)  Because of her impairment, she sometimes forgets to take her medication.  (Id. at 147.)  Her hobbies include reading, watching television, scrapbooking, and doing research on computers.  (Id.)  She does these everyday.  (Id.)  She does not have any problems getting along with family, friends, neighbors, and authority figures.  (Id. at 148, 149.)  Her impairment adversely affects her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, and concentrate.  (Id. at 148.)  The latter difficulty is caused by the medication.  (Id.)  She has no problem following written or spoken instructions.  (Id.)

Plaintiff also completed a Missouri Supplemental Questionnaire.  (Id. at 151-53.)  She reported that the longest period she can sit is for twenty minutes.  (Id. at 152.)  She is able to drive and has a valid driver's license.  (Id.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of her applications.  (<u>Id.</u> at 157-61.)  There had been no change in her condition since she completed the earlier report.  (<u>Id.</u> at 157.)

Plaintiff's longest period of employment was with Kelly Services, Inc., and was in 2006 and 2007.  (<u>Id.</u> at 113-16.)  She earned $6,051[4] in 2006 and $2,820 in 2007.  (<u>Id.</u> at 113.)  She also worked for Kelly Services in 2002.  (<u>Id.</u> at 114.)  In that year, she worked for two other employers also:  a Mexican restaurant and Express Services, Inc.  (<u>Id.</u>)  Her annual earnings were $3,913.  (<u>Id.</u>)   Her highest annual earnings were in 2003 and were $7,237.  (<u>Id.</u> at 113.)  In that year, she worked for two employers, a retirement home and Express Services, Inc.  (<u>Id.</u> at 113-14.)

The medical records before the ALJ begin in 2006 when Plaintiff had an MRI of her lumbar spine in October to investigate the cause of the low back pain radiating into her right leg.  (<u>Id.</u> at 163.)  The MRI revealed a posterior lateral disc protrusion to the right at L5-S1; a mild disc bulge at L4-L5; and degenerative facet changes.  (<u>Id.</u>)

Plaintiff was evaluated by Kevin D. Rutz, M.D., an orthopedist, on November 3.  (<u>Id.</u> at 167-70.)  She explained that her chronic, persistent low back pain had begun seven years earlier, but had increased in the past three to four months.  (<u>Id.</u> at 167.)  Prolonged sitting and standing made the pain worse; lying down and medication lessened the pain.  (<u>Id.</u>)  On examination, Plaintiff was able to toe and heel walk, had a smooth gait, and could, without pain, bend forward with finger tips approaching the ankles.  (<u>Id.</u> at 168.)  Her ability to

---

[4]All amounts have been rounded to the nearest dollar.

extend to neutral was limited due to mid-axial low back pain.  (Id.)  She had a full, painless range of motion in her hips and knees and full lumbar flexion with minimal discomfort.  (Id. at 168, 169.)  Extension caused greater back pain.  (Id. at 169.)  She was tender to palpation in the midline of her lumbar spine, right buttock, and right greater trochanter.[5]  (Id.)  She had no signs of instability.  (Id.)  She had positive straight leg raises on the right.[6]  (Id. at 168, 169.)  X-rays of her lumbar spine revealed mild to moderate narrowing at L5-S1.  (Id. at 169.)  Dr. Rutz' diagnosis was L5-S1 degenerative disc disease, right L5-S1 lumbar disc herniation, and right hip bursitis.  (Id.)  She was given an injection of Depomedrol and Marcaine into her right hip greater trochanteric bursa.[7]  (Id.)

Ten days later, Plaintiff was given a right transforaminal epidural steroid injection at L5-S1.  (Id. at 170.)  Two weeks later, she reported to Dr. Rutz that the injection had given her less than 50 percent improvement for three or four days.  (Id. at 166.)  Dr. Rutz recommended that she undergo a right L5-S1 microdiscectomy.[8]  (Id.)

---

[5]The greater trochanter is "a strong process at the proximal and lateral part of the shaft of the femur . . . ."  Stedman's Medical Dictionary, 1857 (26th ed. 1995) (Stedman's).

[6]"During a [straight leg raising] test a patient sits or lies on the examining table and the examiner attempts to elicit, or reproduce, physical findings to verify the patient's reports of back pain by raising the patient's legs when the knees are fully extended."  **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 n.3 (8th Cir. 2009) (internal quotations omitted).

[7]A bursa is "[a] closed sac or envelope lined with synovial membrane and containing fluid . . . ."  Stedman's at 252.

[8]"In a microdiscectomy . . . a small portion of the bone over the nerve root and/or disc material from under the nerve root is removed to relieve neural impingement and provide more room for the nerve to heal."  Peter F. Ullrich, Jr., M.D. Microdiscectomy (Microdecompression) Spine Surgery, http://www.spine-health.com/treatment/back-surgery/microdiscectomy (last visited Dec.

Plaintiff underwent the microdiscectomy on March 16, 2007. (<u>Id.</u> at 171-72, 214-15.) Dr. Rutz preoperative and postoperative diagnoses were a lumbar disc herniation at right L5-S1 and lumbar radiculopathy. (<u>Id.</u> at 171.) Two weeks later, Plaintiff returned for an office visit. (<u>Id.</u> at 165.) She reported that her right leg pain had "basically resolved." (<u>Id.</u>) She continued to have "some discomfort" in her back. (<u>Id.</u>) Her symptoms were consistent with Dr. Rutz' expectations. (<u>Id.</u>) He informed her she did not need to return unless "her symptoms [took] a significant negative trend." (<u>Id.</u>)

Plaintiff saw Kelly J. Bain, M.D., with Patients First Health Care (Patients First) about a facial rash in June and again in July. (<u>Id.</u> at 208.) The notes of these visits do not include any reference to back pain. (<u>Id.</u>)

In September, she consulted Dr. Bain about hair loss occurring during the past year and weight gain. (<u>Id.</u> at 207.) She had been going to bed at two or three o'clock in the morning and waking up at seven. (<u>Id.</u>) She complained of generalized fatigue and insomnia, which Dr. Bain attributed to her lack of sleep. (<u>Id.</u>) Plaintiff stated that her whole body hurt when she woke up in the morning, and she was always coughing. (<u>Id.</u>) She was still smoking. (<u>Id.</u>) Dr. Bain thought Plaintiff might benefit from an antidepressant, and was to have her checked for thyroid problems. (<u>Id.</u>)

---

28, 2012). It "is typically performed for a herniated lumbar disc and is actually more effective for treating leg pain (also known as radiculopathy) than lower back pain." <u>Id.</u>

In 2008, Plaintiff sought medical attention for an upper respiratory infection. (Id. at 205.) Her only medical requests related to her back pain were refills of Darvocet.[9] (Id.)

Plaintiff consulted the health care providers at Patient First on March 13, 2009, about low back pain that had begun two weeks earlier. (Id. at 200-01.) The pain was moderate and was aggravated by bending, lying down, sitting, and standing. (Id. at 200.) The pain was becoming worse. (Id.) Her current medications included Vicodin[10]; Prednisone was added. (Id. at 201.)

Plaintiff saw Dr. Bain on March 30, reporting that the back pain had begun suddenly eight years earlier and was moderate, persistent, and stable. (Id. at 198-99.) It radiated to both hips, and had improved on the Prednisone. (Id. at 198.) She took Vicodin as needed, but had not needed it for a week. (Id.) She was "a former tobacco user." (Id.) She also complained of a rash on her arm, neck, and face. (Id.) Plaintiff was prescribed a four-week course of physical therapy, three sessions each week, for the back pain. (Id. at 199.)

Plaintiff saw a family nurse practitioner in October about pain and swelling in her right knee caused by a thorn that got stuck in the knee when she knelt on the ground. (Id. at 194-97.)

---

[9]Darvocet is a combination of propoxyphene, a narcotic pain reliever, and acetaminophen. Drugs.com, Darvocet, http://www.drugs.com/search.php?searchterm=darvocet (last visited Dec. 28, 2012). It was withdrawn from the United States market in November 2010. Id.

[10]Vicodin, a combination of hydrocodone (a semisynthetic narcotic analgesic) and acetaminophen, is prescribed for the relief of moderate to moderately severe pain. Physicians' Desk Reference, 575 (65th ed. 2011) (PDR).

Two weeks later, Plaintiff saw Dr. Bain for her back pain. (Id. at 192-93.) She described the severity as a four and the duration as ten years. (Id. at 192.) The pain was persistent, shooting, and burning, and radiated from her upper and lower back to her right thigh. (Id.) Straight leg raises were positive on the right at 45 degrees. (Id.) There was no edema (build-up of fluid), cyanosis (dark bluish or purplish coloration of skin), or clubbing. (Id.) She reported that the pain limited her activities and that she tried to avoid "excess lifting/bending." (Id.) She requested narcotic pain medication. (Id.) Dr. Bain prescribed Vicodin. (Id.)

Plaintiff consulted Keith Ratcliff, M.D., with Patients First on January 18, 2010, for back pain, describing it as being of a gradual onset, a severity level of six, and a duration of three months. (Id. at 190-91.) The pain was persistent and worsening. (Id. at 190.) It radiated from her lower back and neck to her right thigh and right great toe. (Id.) She wondered if consulting a pain management clinic would be helpful. (Id.) On examination, there was no abnormality in her spine. (Id.) There was right tenderness from L3 to S1. (Id.) Straight leg raises were positive to 50 degrees on the left and right. (Id.) She had a normal gait and no edema or cyanosis in her extremities. (Id.) She was to try a Lidoderm patch and was given a refill of Vicodin. (Id.) An x-ray and MRI were to be scheduled. (Id. at 191.)

Two weeks later, Plaintiff had an x-ray of her cervical spine and an MRI of her lumbar spine. (Id. at 202-04.) The former revealed no acute fracture or subluxation,

minimal dextroscoliosis,[11] and no significant degenerative disc disease or facet hypertrophy.[12] (Id. at 204.) The latter revealed a small central disc protrusion and annular tear at L5-S1; granulation tissue in the right lateral recess at L5-S1 surrounding the nondisplaced right S1 nerve root with no mass effect on the thecal sac; small right foraminal disc protrusion at L5-S1; and small central disc protrusion at L4-L5. (Id. at 203.)

Plaintiff saw Dr. Ratcliff on March 8 after stepping on a thorn and sustaining a small puncture wound to the heel pad on her right foot. (Id. at 188-89.) Her medications included Ativan, Cephalexin, Drysol, Lidoderm, Melatonin, and Vicodin. (Id.)

Pursuant to Dr. Bain's referral, Plaintiff consulted Abdul N. Naushad, M.D., with the Advanced Pain Center on April 5. (Id. at 217-20.) She reported that she had an aching, sharp, shooting, and constant pain in her neck, back, and right lower extremity. (Id. at 217.) The pain was not relieved by injections, physical therapy, Darvocet, or Vicodin. (Id.) Percocet[13] helped. (Id.) She rated the pain as an eight on a ten-point scale; it had not changed in location or quality since its onset. (Id.) It had a moderate affect on her functioning, interfered with her sleep, and had been present for a few years. (Id.) Any physical activity aggravated the pain. (Id.) On examination, she exhibited mild to moderate diffuse tenderness in her cervical spine, severe tenderness to the right of L4 and L5 in her

_____

[11]Dextroscoliosis is the curvature of the spine to the right. See Stedman's at 471, 1584.

[12]Hypertrophy is a "[g]eneral increase in bulk of a part or organ, not due to tumor formation." Stedman's at 832.

[13]Percocet is a combination of oxycodone hydrochloride and acetaminophen and is prescribed for the relief of moderate to severe pain. PDR at 1096-97.

lumbar spine, and moderate tenderness to the left. (Id. at 218.) Her reflexes and muscle strength and tone were normal, as was her range of motion in her cervical, thoracic and lumbar spine. (Id.) Straight leg raises were positive on the right. (Id.) She was alert and oriented to time, place, person, and situation. (Id.) Dr. Naushad's diagnosis was cervical facet arthropathy[14]; lumbar discogenic pain; lumbar facet arthropathy/degenerative disc disease/spondylosis; and post-surgical lower back pain. (Id. at 219.) Plaintiff was prescribed gabapentin,[15] to be taken once at night for fifteen days; oxycodone (Percocet[16]) to be taken every six hours as needed; and Ultram (tramadol),[17] to be taken daily for fifteen days. (Id. at 218.) She was advised to stop smoking. (Id.) Dr. Naushad noted that Plaintiff's overall functioning on Percocet was okay. (Id.) She was to return in two weeks, and did. (Id. at 221-23.) Her pain at L4 and L5 was then moderate, and was a six on a ten-point scale. (Id. at 221, 222.) The musculoskeletal examination findings were as before. (Id. at 221.) Her activities of daily living, including her mood, sleep patterns, and overall functioning, were all "better." (Id. at 222.) Her prescription for gabapentin was changed to two capsules at night. (Id.) Ultram was to be taken daily for thirty days. (Id.) The oxycodone prescription remained as before. (Id.)

---

[14]Arthropathy is "[a]ny disease affecting a joint." Stedman's at 150.

[15]Gabapentin is prescribed for "a range of neuropathic pain conditions." See Neurontin (gabapentin), http://www.medilexicon.com/drugs/neurontin_783.php (last visited Dec. 28, 2012).

[16]See note 13, supra.

[17]Ultram is "a narcotic-like pain reliever" prescribed for the treatment of moderate to severe pain. Ultram, http://www.drugs.com/search.php?searchterm=ultram (last visited Dec. 28, 2012).

The next week, Plaintiff had a transforaminal epidural injection. (Id. at 224-26.) One week later, she told Dr. Naushad that the injection had helped her leg pain, but not her back pain. (Id. at 227.)

Plaintiff had another injection on May 15 and again on June 4. (Id. at 228-31.)

One week later, Dr. Naushad doubled Plaintiff's dosage of gabapentin and added Baclofen (a muscle relaxer[18]) to her medication regimen. (Id. at 232-34.) Plaintiff reported feeling better since her last injection. (Id. at 232.) She had no new symptoms or any adverse or side effects to her medications. (Id.) She had a normal range of motion in her cervical, thoracic, and lumbar spine. (Id.) Her muscle strength and reflexes were normal. Straight leg raises were positive on the right. (Id.) She had mild to moderate diffuse tenderness off the midline of her cervical spine and at L4 and L5 of her lumbar spine. (Id.) Plaintiff then rated her pain as a seven. (Id. at 233.) Plaintiff described her pain as a six at her July visit. (Id. at 235-37.) Her chief complaint was of neck and back pain. (Id. at 235.) Her tenderness at various points on her spine was described as mild or, at L5, as mild and diffusely moderate. (Id. at 235.) She had a normal range of motion in her cervical and thoracic spine. (Id.)

At her August visit, Plaintiff reported experiencing feelings of anger when taking Percocet; Nucynta[19] was prescribed instead. (Id. at 238-40.) Again, her pain was a six. (Id.

---

[18]See Baclofen, http://www.drugs.com/search.php?searchterm=baclofen (last visited Dec. 28, 2012).

[19]Nucynta is an opioid analgesic prescribed for the relief of moderate to severe acute pain. PDR at 2720.

at 239.)  When Plaintiff next saw Dr. Naushad, three weeks later, her pain was again a seven.  (Id. at 241-42.)  Her chief complaint was of low back pain.  (Id. at 241.)  She had a normal range of motion in her lumbar and thoracic spine.  (Id.)  As before, she had mild to moderate tenderness at L4 and L5.  (Id.)  Nucynta was discontinued; hydrocodone[20] was prescribed instead.  (Id.)

Plaintiff reported in September that the Baclofen was not strong enough.  (Id. at 243-45.)  Gabitril[21] was prescribed instead.  (Id. at 244.)  Her pain was a ten.  (Id.)  A random drug urine test was negative for narcotics.  (Id. at 248.)  Plaintiff informed Dr. Naushad in October that she had stopped taking the Gabitril after reading about its side effects.  (Id. at 246-48.)  Her pain was a six.  (Id. at 248.)

Also before the ALJ were reports generated pursuant to Plaintiff's DIB and SSI applications, including that of a physical examination she underwent in February 2010 by Alan H. Morris, M.D.  (Id. at 174-78.)  Plaintiff reported to Dr. Morris that her back and leg pain had recurred within a month of the microdiscectomy.  (Id. at 174.)  She had not returned to the surgeon, but had begun seeing her own doctor.  (Id.)  Her only diagnostic study after the microdiscectomy was an MRI.  (Id.)  She had been referred to a pain management clinic and had an appointment the next week.  (Id.)  She described her pain as

---

[20]See note 10, supra.

[21]Gabitril "is indicated as an adjunctive therapy . . . in the treatment of partial seizures."  PDR at 964.  The most common side effects include "dizziness/light-headedness, asthenia/lack of energy, somnolence, nausea, nervousness/irritability, tremor, abdominal pain, and thinking abnormal/difficulty with concentration or attention."  Id. at 966.

mid-line low back pain radiating to both thighs and, sometimes, to the left tibia and, at other times, to the right toe.  (Id.)  The pain was increased by "virtually any activity during daily living."  (Id.)  She began being uncomfortable after sitting for two minutes, standing for five, and walking for twenty.  (Id.)  She could lift eight pounds.  (Id.)  She had numbness and tingling in both legs.  (Id.)  She did not use a cane or brace.  (Id.)  She dressed and bathed independently, but had help with housekeeping chores.  (Id.)  Her mother did the cooking; her husband did the shopping.  (Id.)  She slept for only a few hours at a time.  (Id. at 175.)  She could walk 50 feet.  (Id.)  She had a normal gait; stood erect; and could toe walk and heel walk normally.  (Id.)  Her tandem gait was also normal.  (Id.)  She could lumbar flex to 50 degrees, extend 10 degrees, and bend laterally to the right and left to 20 degrees.  (Id. at 175, 178.)  She had a normal range of motion in her cervical spine.  (Id. at 178.)  Her sitting posture was normal, although she needed to stand and move about after a short time.  (Id. at 175.)  Her deep tendon reflexes were 2/4 in both knees and ankles. (Id.)  She could squat to 140 degrees bilateral knee flexion.  (Id.)  Without difficulty, she could dress and undress, get on and off the examination table, and rise out of a chair.  (Id.)  Straight leg raising was to 90 degrees sitting, 80 degrees supine on the left, and 50 degrees supine on the right.  (Id. at 175, 178.)  She had no measurable or visible atrophy in her lower extremities and had a normal range of motion in her hips.  (Id.)  Her only medication was Vicodin.  (Id. at 175.)  Dr. Morris' diagnosis was prior lumbar disc surgery at L5-S1 right with degenerative disc disease and recurrent pain.  (Id.)

Two weeks later, a Physical Residual Functional Capacity Assessment (PRFCA) of Plaintiff was completed by Geraldine Boeger, a "single decision-maker"[22] and not a medical consultant. (Id. at 179-84.) The primary diagnosis was degenerative disc disease; there was no other diagnosis. (Id. at 179.) This impairment resulted in exertional limitations of Plaintiff being able to occasionally and frequently lift or carry ten pounds and stand, sit, or walk about six hours in an eight-hour day. (Id. at 180.) Her abilities to push and pull were otherwise unlimited. (Id.) She had no postural. manipulative, visual, communicative, or environmental limitations. (Id. at 181-82.)

### The ALJ's Decision

Analyzing Plaintiff's application under the Commissioner's five-step evaluation process, see pages 20 to 23, infra, the ALJ first found that Plaintiff met the insured status requirements of the Act through March 31, 2011, and had not engaged in substantial gainful activity since her alleged disability onset date of March 16, 2007. (Id. at 11-12.) The ALJ next found that Plaintiff had severe impairments of lumbar spine degenerative disc disease and residuals of lumbar microdiscectomy surgery. (Id. at 12.) She also had a non-severe impairment of cervical facet arthropathy. (Id.) Although she had testified about neck-related problems, she had not alleged any neck pain on her disability report and had not complained of such at the February 2010 consultative examination; her medical records had

---

[22]See 20 C.F.R. §§ 404.906, 416.1406 (defining role of single decisionmaker under proposed modifications to disability determination procedures). See also **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

not reflected any cervical spine problems before 2010; January 2010 x-rays of her cervical spine had showed only minimal dextroscoliosis; and, the physician who had diagnosed her cervical facet arthropathy had consistently noted that she had a normal range of motion in her cervical spine and had not administered any treatment specifically for the arthropathy. (Id. at 12-13.) "Overall, the objective medical evidence shows only mild abnormalities of the cervical spine, for which [Plaintiff] has received only minimal treatment." (Id. at 13.) The ALJ concluded that Plaintiff's impairments, alone or in combination, did not meet or medically equal an impairment of listing-level severity, including Listing 1.04 for disorders of the spine. (Id. at 13.)

Next, the ALJ considered Plaintiff's residual functional capacity (RFC). (Id. at 13-18.) After summarizing her medical records, he evaluated her allegations and testimony. (Id.) He noted that she had repeatedly been observed as having a good range of motion in her lumbar and cervical spine, a normal gait and posture, only mild tenderness and mild to no muscle spasm, and no measurable or visual lower extremity atrophy. (Id. at 14, 16.) She had not been advised to abstain from lifting or participating in activities. (Id.) At the consultative examination, she could squat, dress, and change positions without apparent difficulty. (Id. at 16.) She had also advised Dr. Naushad that her medications were helping and her functioning was improving. (Id.) Additionally, the ALJ found Plaintiff's allegations not to be supported by her treatment history, noting, inter alia, that she had no complaints

of, or treatment for, back problems between March and December 2007[23] although she stated that her back and leg pain and recurred within weeks of the lumbar microdiscectomy and had no treatment at all in 2008 other than refills of pain medication. (Id.) A negative urine drug test in September 2010 suggested that she had not needed to take her pain medication as frequently as alleged. (Id.) She testified about extreme functional limitations, e.g., an ability to stand for only five minutes and a need to rest every day, but never described such to any physician. (Id. at 17.) Also detracting from her credibility were the inconsistent statements in the record, e.g., reporting that she prepared simple meals and shopped and then telling the consultative examiner she did neither; her daily activities, e.g., home-schooling two of her children until fall 2010; and her sporadic work record. (Id. at 17-18.) She had the RFC to perform the full range of light work. (Id. at 13.)

With her RFC, Plaintiff could perform her past relevant work as a production assembler and as a postage machine operator. (Id. at 18.) She was not, therefore, disabled within the meaning of the Act. (Id. at 19.)

### Legal Standards

Under the Act, the Commissioner shall find a person disabled "if [s]he is unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered

---

[23]The Court notes that Plaintiff did not have any treatment for back pain in December 2007. Rather, a notation of "chronic pain" is included in the record of her well woman examination that month. (See id. at 206.)

must be "of such severity that [the claimant] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . [s]he would be hired if [s]he applied for work."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  Second, the claimant must have a severe impairment.  See 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  A severe impairment is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  20 C.F.R. §§ 404.1520(c), 416.920(c).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement.  See 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii) and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits.  **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)). "'[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "'(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011) (quoting Moore, 572 F.3d at 524). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" **Id.** (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)).

Moreover, an ALJ is not required to methodically discuss each of the relevant credibility factors, "'so long as he acknowledge[s] and examine[s] those considerations before discounting a claimant's subjective complaints.'" **Renstrom v. Astrue**, 680 F.3d 1057, 1067 (8th Cir. 2012) (quoting Partee v. Astrue, 638 F.3d 860, 865 (8th Cir. 2011)).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Additionally, "[a]n ALJ may find the claimant able to perform past relevant work if the claimant retains the ability to perform the functional requirements of the job as she actually performed it or as generally required by employers in the national economy." **Samons v. Astrue**, 497 F.3d 813, 821 (8th Cir. 2007). The burden at step four remains with the claimant. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). The Commissioner may meet his burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and

capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by her impairment from doing any other work, the ALJ is to find the claimant to be disabled.

The ALJ's decision – adopted by the Commissioner when the Appeals Council denied review – whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Perkins v. Astrue**, 648 F.3d 892, 897 (8th Cir. 2011) (quoting Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009)). When reviewing the record, however, the Court "'must consider evidence that both supports and detracts from the ALJ's decision, but [may not] reverse an administration decision simply because some evidence may support the opposite conclusion.'" **Id.** (quoting Medhaug, 578 F.3d at 813). "'If, after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision.'" **Id.** (quoting Medhaug, 578 F.3d at 897). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

<u>**Discussion**</u>

Plaintiff argues that the ALJ erred (1) by failing to properly consider the combined effects of her medically determinable impairments, specifically her cervical intevertebral disc degeneration; (2) by failing to properly assess her RFC; and (3) when evaluating her credibility.

<u>Plaintiff's Cervical Problems and RFC.</u> Title 20 C.F.R. §§ 404.1523, 416.923 require that the ALJ "consider the combined effect of all of [a claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity."

In **<u>Browning v. Sullivan</u>**, 958 F.2d 817, 821 (8th Cir. 1992), the Eighth Circuit rejected the claimant's argument that the ALJ had not considered whether her impairments in combination were disabling. The court found that the ALJ's conclusion that her impairments did not prevent her from performing past relevant work preceded by a discussion of her physical and mental impairments, her complaints of pain, and her daily activities was sufficient and that "[t]o require a more elaborate articulation of the ALJ's thought processes would not be reasonable." **<u>Id.</u>** (internal quotations omitted). Similarly, in **<u>Hajek v. Shalala</u>**, 30 F.3d 89, 92 (8th Cir. 1994), the court held that the ALJ's references to "evidence as a whole" and to the plural "symptoms" and "impairments" reflected a proper consideration of the combined effects of the claimant's impairments.

In the instant case, the ALJ found Plaintiff had severe impairment*s* of degenerative disc disease of the lumbar spine and residuals of lumbar microdiscectomy surgery; decided,

- 24 -

after reviewing and summarizing the record, that she did not have a severe impairment of her cervical spine; summarized all the medical evidence; discussed Plaintiff's symptom*s* and her statements describing her symptoms; and concluded that she could return to her past relevant work. This is sufficient to demonstrate that the ALJ properly considered the combined effect of Plaintiff's impairments.

Plaintiff further specifically challenges the ALJ's decision that her cervical spine problems were not a severe impairment. This decision, however, is supported by substantial evidence on the record as a whole. As noted by the ALJ, Plaintiff did not cite any cervical problems when applying for DIB or when describing in the Disability Report why her impairments prevented her from working. Indeed, the first reference to neck pain is a description made three months after she applied for DIB and is of pain radiating from her low back and neck to her right thigh and right great toe. An x-ray of her cervical spine revealed only minimal dextroscoliosis and no significant degenerative disc disease or facet hypertrophy. The following month, Plaintiff did not complain of any cervical problems when undergoing a consultative examination. Two months later, she complained to Dr. Naushad of an aching, sharp, shooting, and constant pain in her neck. The examination performed at that visit and at later visits consistently revealed a normal range of motion in her neck and, at worst, mild to moderate diffuse tenderness in her neck. The only evidence

supporting Plaintiff's argument that her cervical problems imposed any functional limitations was her testimony. This was found not to be credible.[24]

After analyzing Plaintiff's impairments and the combination thereof, the ALJ concluded that she had the RFC to perform the full range of light work.[25] Plaintiff argues that this conclusion is not supported by any medical opinion and that rather than citing the silence of her physicians about her functional limitations and abilities, the ALJ should have recontacted them to obtain their opinion on such and not "played doctor[.]" (Pl. Br. at 13, ECF No. 12.)

"The RFC 'is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities,' despite his or her physical or mental limitations." **Roberson v. Astrue**, 481 F.3d 1020, 1023 (8th Cir. 2007) (quoting SSR 96-8p, 1996 WL 374184, at *3 (July 2, 1996)); accord **Masterson v. Barnhart**, 363 F.3d 731, 737 (8th Cir. 2004); **Depover v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003). "When determining a claimant's RFC, the ALJ must consider all relevant evidence, including the claimant's own description of her or his limitations, as well as medical records, and observations of treating physicians and others." **Roberson**, 481 F.3d at 1023. See also SSR 96-8p, 1996 WL 374184 at *5 (listing factors to be considered when assessing a claimant's RFC, including, among other things, medical history, medical signs and laboratory findings,

---

[24]The question whether the ALJ erred in his assessment of Plaintiff's credibility is addressed below.

[25]See note 2, supra.

effects of treatment, medical source statements, recorded observations, and "effects of symptoms . . . that are reasonably attributed to a medically determinable impairment"). "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (second alteration in original).

Plaintiff does not argue that the medical evidence that was cited by the ALJ does not support his RFC conclusion. Rather, she contends that the ALJ must have engaged in conjecture when assessing her RFC given the lack of any opinions by her treating physicians about her functional capabilities. In support of this contention, Plaintiff cites **Nevland v. Apfel**, 204 F.3d 853, 858 (8th Cir. 2000) (holding that ALJ should obtain medical evidence addressing claimant's "ability to function in the workplace"), and **Hutsell v. Massanari**, 259 F.3d 707, 711-12 (8th Cir. 2001). Her reliance on these cases is unavailing. As the Eighth Circuit noted in **Eichelberger v. Barnhart**, 390 F.3d 584, 591 (8th Cir. 2004), the claimant in **Nevland** had established that he was unable to perform his past relevant work; thus, the burden of proof had shifted to the Commissioner. In the instant case, the ALJ determined that Plaintiff could return to her past relevant work; thus, the burden remained with Plaintiff. In **Hutsell**, the court held that there was *no* medical evidence supporting the ALJ's conclusion that the claimant had the RFC to perform work other than that requiring "highly complex

tasks requiring abstract thinking or close interpersonal contact." 259 F.3d at 711. The claimant suffered from chronic schizophrenia disorder, possible bipolar disorder, and borderline intellectual functioning. **Id.** at 710. The ALJ found the psychiatric disorders were controlled by medication; however, the medical evidence before him was that she had been hospitalized three times for unpredictable psychotic episodes, had not been discharged by her primary treating physician and was *required* to see him frequently, and had been found by two consulting psychiatrists to have a "nonexistent" capacity for sustained employment. **Id.** at 712. The only medical opinion supporting an ability of the claimant for "some" work was by a consulting psychologist and yet was more restrictive than the decision of the ALJ. **Id.** In this context, the court held that the ALJ's RFC finding was not supported by any medical evidence. **Id.** In the instant case, there is medical support for the ALJ's RFC findings. This support includes repeated examination findings of a normal gait and posture, normal muscle tone and bulk, normal ranges of motion in her lumbar, thoracic, and cervical spine, and, at worst, mild to moderate tenderness in the various portions of her spine. Unlike the record before the ALJ in **Hutsell**, there is no conflicting evidence. Indeed, in **Hutsell**, there was *only* conflicting evidence.[26]

---

[26]Similarly, in **Wilcutts v. Apfel**, 143 F.3d 1134, 1137-38 (8th Cir. 1998), also cited by Plaintiff, the issue arose at step five – when the Commissioner has the burden of proof – whether the claimant could read. There was evidence, including from the claimant, a doctor, and a worker at the Social Security Administration, that he could not. The ALJ had decided, based on the findings of an orally-administered IQ test, that he could. The case was remanded for testing to resolve the illiteracy question. Thus, when the Commissioner had the burden of proof there was strong evidence disputing the ALJ's RFC finding. Again, in the instant case, the issue arose when Plaintiff has the burden of proof and there is no evidence in conflict with the ALJ's RFC finding.

Plaintiff conflates the duty of the ALJ to develop the record with an obligation to solicit evidence on a developed record that lacks support for a claimant's position. An "'ALJ is not required to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped.'" **Jones v. Astrue**, 619 F.3d 963, 969 (8th Cir. 2010) (quoting Goff, 421 F.3d at 791). Here, a crucial issue was not undeveloped; rather, it was developed adversely to Plaintiff.

Plaintiff's Credibility. "'If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination.'" **Renstrom**, 680 F.3d at 1065 (quoting Juszcyzk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008)). Plaintiff argues that the Court should not defer to the ALJ's adverse credibility determination because he improperly (a) assessed her daily activities, (b) did not consider her use of prescription pain medication, and (c) ignored objective medical evidence of her severe degenerative disc disease. The Commissioner disagrees.

Plaintiff correctly notes that "a claimant 'need not be totally bedridden in order to be unable to work' . . . ." **Wagner**, 499 F.3d at 851 (quoting Roberson, 481 F.3d at 1025). The daily activities described by Plaintiff at the hearing, the most strenuous of which were driving her children to school, are consistent with her allegations of disabling pain. They are inconsistent, however, with the activities she described on a Function Report. See **Buckner**, 646 F.3d at 558 (holding that an ALJ may discredit complaints of disabling pain "if there are inconsistencies in the evidence as a whole") (internal quotations omitted); accord **Partee**, 638 F.3d at 865; **Van Vickle v. Astrue**, 539 F.3d 825, 828 (8th Cir. 2008). And, the

severely-restricted activities she describes are inconsistent with the medical evidence. See **Choate v. Barnhart**, 457 F.3d 865, 871 (8th Cir. 2006) (finding ALJ's adverse credibility determination was supported by record, including the inconsistencies between claimant's "self-reported limitations on his daily activities" and the medical record).

Plaintiff does take prescription pain medication.[27] The absence of such has been found to distract from a claimant's credibility. See e.g. **Swope v. Barnhart**, 436 F.3d 1023, 1024 (8th Cir. 2006); **Rankin v. Apfel**, 195 F.3d 427, 429 (8th Cir. 1999); **Gray v. Apfel**, 192 F.3d 799, 803-04 (8th Cir. 1999). In the instant case, it does not require that the ALJ's credibility determination be reversed. Plaintiff was prescribed pain medication in response to her subjective complaints. She informed Dr. Naushad that Percocet helped, and he later noted that her overall functioning was okay. Moreover, even if this consideration detracts from the ALJ's credibility determination, other considerations support it.

For instance, the ALJ properly considered that the lack of any functional restrictions placed on Plaintiff by her physicians detracts from her credibility. See **Moore**, 572 F.3d at 525 (holding that "[a] lack of functional restrictions is inconsistent with a disability claim"); **Samons**, 497 F.3d at 820-21 (affirming adverse credibility determination supported, in part, by absence of any functional limitations placed on claimant who described disabling back pain). He also considered Plaintiff's failure to stop smoking as advised to by her doctors, including Dr. Naushad. "A failure to follow a recommended course of treatment . . . weighs

---

[27]The Court notes that one negative urine drug screen suggested she did not always take such medication.

against a claimant's credibility." **Guilliams v. Barnhart**, 393 F.3d 798, 802 (8th Cir. 2005).

See also **Wheeler v. Apfel**, 224 F.3d 891, 895 (8th Cir. 2000) (finding that ALJ properly considered claimant's failure to stop smoking when discrediting her complaints of disabling pain); accord **Kisling v. Chater**, 105 F.3d 1255, 1257 (8th Cir. 1997). And, her sporadic work history supports the ALJ's credibility decision. See **Hutton v. Apfel**, 175 F.3d 651, 655 (8th Cir. 1999); **Comstock v. Chater**, 91 F.3d 1143, 1147 (8th Cir. 1996); **Siemers v. Shalala**, 47 F.3d 299, 301 (8th Cir. 1995).

Moreover, although "'[a]n ALJ may not discount a claimant's subjective complaints solely because the objective medical evidence does not fully support them," **Renstrom**, 680 F.3d at 1066 (quoting Wiese, 552 F.3d at 733), the absence of objective medical evidence to support a claimant's complaints is a proper consideration when assessing that claimant's credibility, **id.** at 1065. Accord **Mouser v. Astrue**, 545 F.3d 634, 638 (8th Cir. 2008). Plaintiff argues that Dr. Rutz' diagnoses of a lumbar disc herniation at right L5-S1 and lumbar radiculopathy support her subjective complaints. These diagnoses were made when Plaintiff underwent a microdiscectomy in March 2007. Two weeks later, she reported that her right leg pain had "basically resolved" and she had "some discomfort" in her back. (R. at 165.) Dr. Rutz expected such, and told her she need not return unless her condition significantly deteriorated. She did not return. Indeed, she did not seek treatment for back pain for two years after the surgery.[28] The doctors she did subsequently see consistently

---

[28]The record reveals that Plaintiff told the consultative examiner, Dr. Morris, that she had not returned to Dr. Rutz after the surgery, but had seen her own doctor instead. Regardless, she did not seek treatment from her own doctor for back pain until March 2009.

reported that she had normal muscle tone and bulk, normal ranges of motion, and normal gait and posture. A later MRI showed a small disc protrusion. Thus, the objective medical evidence does not support Plaintiff's subjective complaints; instead, the evidence detracts from those complaints.[29]

The ALJ's credibility determination is explained and supported by the substantial evidence on the record as a whole. It should not be reversed.

### Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "If substantial evidence supports the ALJ's decision, [the Court] [should] not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because [the Court] would have decided differently." **Wildman v. Astrue**, 596 F.3d 959, 964 (8th Cir. 2010). Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be AFFIRMED and that this case be DISMISSED.

The parties are advised that they have **fourteen days** in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an

---

[29]The Court notes that there are also inconsistencies in the record about the duration of Plaintiff's back pain that undermine her credibility. She informed Dr. Bain in March 2009 that she had had the pain for eight years; she informed Dr. Ratcliff in January 2010 that it had been three months; and, she informed Dr. Naushad in April 2010 that it had been a few years.

extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  25th  day of January, 2013.